IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| WILLIAM ALLEN GOBLE, | : | CIVIL ACTION NO. |
| | : | 1:15-CV-0801-AT-JSA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **FINAL REPORT AND** |
| CITY OF SMYRNA, GEORGIA, | : | **RECOMMENDATION ON A** |
| | : | **MOTION FOR SUMMARY** |
| Defendant. | : | **JUDGMENT** |

Plaintiff William Allen Goble filed the above-styled civil action on March 18, 2015. Plaintiff alleges that he was employed by the City of Smyrna, Georgia ("Defendant" or "Smyrna") as a firefighter from October 3, 1990 until June 2, 2014, when his employment was terminated. He alleges that he has a disability and that Defendant discriminated against him on the basis of his disability and retaliated against him for requesting an accommodation for his disability, in violation of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. §§ 12101 *et seq.*, and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 794 *et seq.*

The action is before the Court on the Defendant's Motion for Summary Judgment [44]. For the reasons discussed below, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [44] be **GRANTED**, and that judgment be entered in favor of Defendant on all of Plaintiff's claims.

## I. FACTS

Unless otherwise indicated, the Court draws the following facts from "Defendant's Statement of Undisputed Material Facts as to Which There Is No Genuine Issue To Be Tried" [44-1] ("Def. SMF") and "Plaintiff's Statement of Additional Material Facts Which Present a Genuine Issue for Trial" [51] ("Pl. SMF"). The Court also draws some facts from Plaintiff's "Response to Statement of Undisputed Material Facts" [50] ("Pl. Resp. SMF") and "Defendant's Response to Plaintiff's Statement of Additional Material Facts Which Present a Genuine Issue for Trial" [54] ("Def. Resp. SMF").

For those facts submitted by the Defendant that are supported by citations to record evidence, and for which the Plaintiff has not specifically disputed and refuted with citations to record evidence showing a genuine dispute of fact, the Court deems those facts admitted, pursuant to Local Rule 56.1B. *See* LR 56.1(B)(2)(a)(2), NDGa ("This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B.(1).").

The Court has excluded assertions of fact by either party that are immaterial or presented as arguments or legal conclusions, and has excluded assertions of fact unsupported by a citation to evidence in the record or asserted only in the party's brief and not the statement of facts. *See* LR 56.1B, NDGa ("The court will not consider any fact: (a) not supported by a citation to evidence . . . or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts."). The Court has also viewed all evidence and factual inferences in the light most favorable to Plaintiff, as required on a defendant's motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993).

The Court notes that both parties have objected to some of the opposing party's proffered facts on the ground that an asserted fact is not relevant or material to the claims and defenses presented in this case. The Court nevertheless includes some of those facts because they provide background information that is helpful to explain the context of the parties' asserted facts and contentions. The parties also attempt to dispute some of the opposing party's proffered facts, but the majority of these disputes are over minor and immaterial issues. Accordingly, the Court will not rule on each and every objection or dispute presented by the parties, and will discuss those objections

and disputes in the analysis section only when necessary to do so regarding a genuine dispute of a material issue of fact. Thus, unless stated otherwise, the Court assumes the facts as stated by Plaintiff.

Plaintiff William Allen Goble began his employment as a firefighter with Smyrna in 1990. Def. SMF at ¶ 1; Goble Dep. [41] at 68. Plaintiff was promoted to Lieutenant around 2007. Def. SMF at ¶ 2; Goble Dep. at 68. As a Lieutenant, Plaintiff's responsibilities included responding to emergency calls for service, supervising assigned personnel, administering firefighter training, and communicating with others to coordinate work activities, review the status of work, exchange information, resolve problems, or give and receive advice and direction. Def. SMF at ¶ 3; Goble Dep. at 77-84, Ex. 7. Plaintiff reported to a Battalion Chief. Def. SMF at ¶ 4; Goble Dep. at 73; Day Dep. [49] at 10-11.

In June 2013, Plaintiff received his annual performance evaluation from his then-Battalion Chief, Eric Farmer. Def. SMF at ¶ 5; Goble Dep. at 99-101; Ex. 11. Farmer's evaluation gave Plaintiff a "2" (Successful Minus/Needs Improvement) in the "Attitude" category and noted that Plaintiff had received a reprimand for insubordination in March 2013. Def. SMF at ¶ 6; Goble Dep. Ex. 11. In the evaluation, Farmer also noted that Plaintiff "has a lot of potential but refuses to engage in the department and lacks commitment" and "at times is disrespectful towards other

co-workers and upper management." Def. SMF at ¶ 7; Goble Dep. Ex. 11. Plaintiff disagreed with the evaluation and brought it to Roy Acree, then-Deputy Chief, for further review. Def. SMF at ¶ 8; Goble Dep. at 102-104.

In July of 2013, during Plaintiff's meeting with then-Deputy Chief Acree, or shortly thereafter, Plaintiff told Acree that he had been diagnosed with post-traumatic stress disorder ("PTSD") and asked whether Smyrna could do anything to accommodate him. Def. SMF at ¶ 9; Acree Dep. [48] at 28-31. Acree referred Plaintiff to Human Resources and agreed to reconsider Plaintiff's evaluation. Def. SMF at ¶ 10; Acree Dep. at 21-23, 30-31, 51. Acree later revised Plaintiff's score in the Attitude category from a 2 to a 3, which brought Plaintiff's overall score up to a 3.0 (Successful) from a Successful Minus/Needs Improvement rating. Def. SMF at ¶¶ 11, 83; Acree Dep. at 21-23, Ex. 6; Goble Dep. at 107-10, Ex. 12. This change was made as a "concession" for Plaintiff's PTSD. Def. SMF at ¶¶ 12, 82; Acree Dep. at 51; Goble Dep. Ex. 11.

On or about July 5, 2013, Kay Bolick, Director of Human Resources, received a letter from Plaintiff's treating psychologist, Dr. Richard Blue. Def. SMF at ¶ 13; Bolick Dep. [47] at 32-33, Ex. 10. The letter informed Smyrna that Dr. Blue had been treating Plaintiff for three years for "severe Post-Traumatic Stress Disorder brought on by twenty-three years of service in the fire department" and the treatment had

focused on "severe symptoms of anger and rage along with severe depression and anxiety." Def. SMF at ¶ 14; Bolick Dep. at 32-33, Ex. 10. Dr. Blue said his "original recommendation was that [Plaintiff] be placed on full disability. Unfortunately Smyrna was not able to provide adequate insurance coverage for a mental disorder. This left Mr. Goble no alternative but to return to work. The other alternative was no disability and no income." Def. SMF at ¶ 15; Bolick Dep. at 32-33. Dr. Blue recommended that Plaintiff "sit down with management to determine the necessary reasonable accommodations required by law for him to complete his service." Def. SMF at ¶ 16; Bolick Dep. at 32-33.

On July 12, 2013, Bolick sent a letter to Dr. Blue requesting information about how Plaintiff was limited in the performance of his job so that Smyrna could determine whether any reasonable accommodations could be offered. Def. SMF at ¶ 17; Bolick Dep. at 40-41, Ex. 11. Bolick advised Dr. Blue that Plaintiff works in a "safety sensitive position requiring him to make fast decisions that have life and death implications for himself, co-workers and citizens of the community" and "he needs to be able to respond quickly and fully to instructions from others." Def. SMF at ¶ 18; Bolick Dep. at 40-41, Ex. 11. Bolick also expressed concern that Plaintiff had been released to full duty "notwithstanding [Dr. Blue's] apparent belief that Mr. Goble be on full disability" and said that "[b]ecause you would presumably have not released

him to full duty given the potential arising from harm to himself or others, this makes it even more difficult for the City to understand what Mr. Goble's limitations are." Def. SMF at ¶ 19; Bolick Dep. at 40-41. Bolick therefore requested that Dr. Blue identify Plaintiff's limitations so that Smyrna could consider what, if any, accommodations could be offered. Def. SMF at ¶ 20; Bolick Dep. at 40-41. In response, Dr. Blue emailed Bolick on July 19, 2013, and, instead of identifying Plaintiff's limitations as requested, he recommended that "Mr. Goble's limitations should be addressed directly by him and upper management at the fire department. He knows his job better than anyone given the fact that he has been with the fire department for twenty-three years. Mr. Goble only wants to find a way to reduce the level of stress in his job and this is best served with a meeting of all parties." Def. SMF at ¶ 21; Bolick Dep. at 56-58, Ex. 12.

At this point, Bolick had no information as to any specific ways that Plaintiff's ability to perform his job had been compromised. Pl. SMF at ¶ 14; Bolick Dep. at 45. Bolick did not inquire of anyone at the fire department about Plaintiff's ability to perform his job or about any limitations hampering his performance, and she did not contact Plaintiff to determine what limitations he might have. Pl. SMF at ¶¶ 15-17; Bolick Dep. at 43, 46, 48, 58. Nevertheless, Bolick contacted Defendant's outside legal counsel at the employment defense firm of Ellarbee Thompson. Pl. SMF at ¶ 18;

Bolick Dep. at 51-52. Bolick was aware at this point, however, that Dr. Blue had originally assessed Plaintiff as needing full disability and, despite that, authorized his return to work solely because of a perception that Smyrna's insurance plan was inadequate. Bolick Dep. at 32-33.

When Smyrna first received information from Dr. Blue that Plaintiff was trying to find a way to reduce his stress, Chief Acree asked Plaintiff whether he would like to transfer out of the lieutenant's position into a driver position. Def. SMF at ¶¶ 22, 77; Goble Dep. at 149-150. Plaintiff declined, believing that would be an "insult." Def. SMF at ¶¶ 23, 78; Goble Dep. at 149-150. Acree acknowledged that "Allen is not the only person that's ever had problems with social interactions" nor was he the only employee given latitude. Pl. SMF at ¶¶ 10, 12; Pl. Resp. SMF at ¶ 24; Acree Dep. at 54, 70. Dr. Blue sent a letter on July 29, 2013 recommending that Plaintiff continue to function in his role as Lieutenant (which stemmed from his conversation with Acree about the driver position), that Plaintiff's management/supervisor perform only essential communications with Plaintiff, and that Plaintiff's training requirements be reduced to mandatory state required training only. Def. SMF at ¶ 25; Acree Dep. at 58-61, Ex. 13. Dr. Blue still had not identified Plaintiff's workplace limitations. Def. SMF at ¶ 26; Acree Dep. at 61, Exs. 12, 13. Plaintiff testified that he requested the "accommodation" that management/supervisor perform only essential

communications with him because he felt that his supervisor, Farmer, was "harassing" him. Def. SMF at ¶ 27; Goble Dep. at 126, 127, 128. Dr. Blue testified that Plaintiff wanted to be excused from the additional training because he felt he had worked long enough and did not need "to do all of these kinds of things." Def. SMF at ¶ 28; Blue Dep. [42] at 113-14.

Because Dr. Blue did not respond to Smyrna's request to identify Plaintiff's limitations, Smyrna sent Plaintiff to a psychologist, Dr. Heather K. McElroy, for a fitness for duty evaluation in an effort to determine Plaintiff's workplace limitations, if any, so that it could consider whether reasonable accommodations could be offered. Def. SMF at ¶¶ 29, 57; Bolick Dep. at 61-62, Ex. 14; Acree Dep. at 115, Ex. 21; Acree Decl. at ¶ 8. At Dr. McElroy's request, Smyrna provided copies of Plaintiff's doctor's notes and information reflecting Plaintiff's disciplinary history. Def. SMF at ¶ 30; Acree Dep. at 115-16, Ex. 23; Acree Decl. at ¶ 9-10, Ex. A. On August 28, 2013, Dr. McElroy issued her report. Def. SMF at ¶ 31; Bolick Dep. at 61-63, Ex. 14; Acree Dep. at 47-49, Ex. 14.

Dr. McElroy reported that Plaintiff was experiencing symptoms of anxiety and depression that included irritability and emotionality, which had exacerbated his difficulties in the workplace, such as difficulty with authority, getting along well with others, and temper problems, and identified Plaintiff's limitations as an inability to

appropriately handle conflict and a tendency to exhibit emotionally inappropriate behavior. Def. SMF at ¶ 32; Acree Dep. Ex. 14. She further reported that "[t]he limitations associated with his current mental health symptoms make it difficult for him to conform to the behavioral standards of the department and the requirements of his position." Def. SMF at ¶ 33; Acree Dep. Ex. 14. Based on these limitations, Dr. McElroy concluded that Plaintiff was not psychologically fit for duty, but with certain provisions in place, she believed his symptoms could resolve to a level that would allow him to safely and effectively continue working in his position. Def. SMF at ¶ 34; Acree Dep. Ex. 14.

In an effort to return Plaintiff to work, Dr. McElroy prepared and presented a Return to Work Agreement ("Agreement"). Def. SMF at ¶ 35; Goble Dep. at 158-160, Ex. 18; Acree Dep. at 54, Exs. 14, 15. The Agreement contained conditions that Dr. McElroy believed, if agreed to by Plaintiff, would allow Plaintiff to succeed in his job. Def. SMF at ¶ 36; Acree Dep. Exs. 14, 15. The conditions included continuing his counseling sessions; taking any prescribed medications; maintaining emotional control within the work setting; refraining from engaging in physically aggressive behavior or behavior that can be reasonably interpreted as threatening of harm to others; complying with directives issued by his supervisor without resistance or complaint; interacting with others, particularly the public, his supervisors, and fellow firefighters,

in a manner that is appropriate, modulated, and respectful and that otherwise meets the standards of the City of Smyrna; conforming without fail to all legal directives communicated by his superiors within the chain of command; and complying with attendance requirements. Pl. SMF at ¶ 29; Def. SMF at ¶ 37; Goble Dep. at 168-172, Exs. 14, 18; Acree Dep. at 58-70, Ex. 15. The Agreement also includes provisions that state: "If I am unable to demonstrate compliance to the satisfaction of the Fire Chief, I may be subject to a personnel action that may involve a reduction in rank, separation from the Department or some other outcome to be determined." Pl. SMF at ¶ 28; Ex. 15 at 4. In addition, the Agreement reads "[Plaintiff's] full compliance with these terms is a minimal condition of [Plaintiff] being able to work." Pl. SMF at ¶ 29; Acree Dep. Ex. 15 at 4. The terms of the Agreement also include language requiring Plaintiff to "without fail . . . comply fully with . . . directive[s], without resistance or complaint and within a timeframe stipulated or implied by the directive or a timeframe deemed reasonable by the person giving the directive." Pl. SMF at ¶ 30; Acree Dep. Ex. 15 at 8. Though Plaintiff claims this is a "zero-tolerance" policy for his failure to comply with directives, Pl. SMF at ¶ 30; Acree Dep. Ex. 15 at 8, Defendant points out that the Agreement provides for an exception if Plaintiff believes compliance would cause an immediate and substantial risk of harm. Def. Resp. SMF at ¶ 30; Acree Dep. Ex. 15.

Plaintiff contends that the Agreement is "focused" on his disciplinary history and conduct at work. Pl. SMF at ¶ 19; Acree Dep. Ex. 15. Defendant acknowledges that the Agreement contains information regarding Plaintiff's disciplinary history and conduct at work, but argues that it is "focused" on the results of the fit-for-duty evaluation. Def. Resp. SMF at ¶ 19. The Agreement states that the fire department "has determined, based on observations of episodes of conflicts between you and your supervisors and poor decision-making and outbursts of anger/cursing in interactions with others in the fire department, that you may have diminished ability to safely and effectively occupy a Fire Lieutenant position and to otherwise further the mission of the Department." Pl. SMF at ¶ 19; Acree Dep., Ex. 15. At the time Plaintiff disclosed his treatment for PTSD, anxiety, and depression, there was no pending disciplinary action against him. Pl. SMF at ¶ 20; Acree Dep. at 148; Day Dep. at 14. Neither Bolick nor Acree had any plans to require Plaintiff to submit to a fitness for duty evaluation prior to his disclosure of his PTSD diagnosis. Pl. SMF at ¶¶ 21-23; Bolick Dep. at 79; Acree Dep. at 57, 148. The Agreement notes that "the conclusion of the fitness for duty evaluation was that you are currently experiencing symptoms of a diagnosable mental impairment, including difficulty regulating emotion, increased irritability, fatigue, a general sense of being overwhelmed, and a lost [sic] of interest in activities." Pl. SMF at ¶ 25; Acree Dep. Ex. 15 at 2. Plaintiff had the opportunity

to review and propose modifications to the Agreement. Def. SMF at ¶ 38; Goble Dep. at 158-160. Plaintiff claims he was told "if you don't sign it, you don't work here." Pl. SMF at ¶ 27; Goble Dep. at 161. Defendant contends that, though Plaintiff does not state who made this statement, it had to have been Dr. McElroy, because Dr. McElroy prepared and presented the Agreement. Def. SMF at ¶ 35; Pl. Resp. SMF at ¶ 35; Def. Resp. SMF at ¶ 27; Goble Dep. at 158-160, Ex. 18; Acree Dep. at 54, Exs. 14, 15. Moreover, Acree and Bolick both testified that they do not know what would have occurred if Plaintiff refused to sign the Agreement. Def. Resp. SMF at ¶ 27; Acree Dep. at 57-58; Bolick Dep. at 75. On October 1, 2013, Plaintiff executed the Agreement and returned to work.[1] Def. SMF at ¶ 39; Goble Dep. at 162-63, Ex. 18.

Paige Day became the Fire Chief in January 2014. Def. SMF at ¶ 40; Day Dep. at 11. Four months into her tenure as Chief, on or about May 21, 2014, she received a report from Battalion Chief Danny Bruce about an incident involving Plaintiff. Def. SMF at ¶ 41; Day Dep. at 38, Ex. 18. Essentially, Bruce, Plaintiff's supervisor at the time, received an email related to a new FLSA schedule for firefighters that was likely to require some overtime work. Pl. Resp. SMF at ¶ 42; Day Dep. at 39-41. Bruce

[1]Though Plaintiff does not dispute this fact, he adds that "if he had not signed it, he would not have been returned to work." Pl. SMF at ¶ 39. However, Plaintiff does not cite to any evidence in the record to support this claim.

reported that while he was discussing the possibility that Plaintiff would have to work mandatory overtime, Plaintiff protested, stating "they can talk to my fucking attorney I ain't workin [sic] it." Def. SMF at ¶ 42; Pl. Resp. SMF at ¶ 42; Day Dep. at 39, Ex. 18; Goble Dep. at 180. Later, Bruce called Plaintiff to tell him he was up next for overtime, and Plaintiff questioned the accuracy of the records. Pl. Resp. SMF at ¶ 42; Goble Dep. at 31-32. Plaintiff and Bruce then agreed to speak again later. Pl. Resp. SMF at ¶ 42; Goble Dep. at 31-32. Bruce contacted Deputy Chief Acree for guidance, and Acree directed him to pass over Plaintiff and go to the next person in line for overtime. Def. SMF at ¶ 44; Pl. Resp. SMF at ¶ 42; Day Dep. Ex. 18; Acree Dep. at 80-84; Goble Dep. at 31-32. Acree called Goble to tell him he was being removed from the overtime book as an accommodation for his PTSD. Pl. Resp. SMF at ¶ 42; Goble Dep. at 31-32. Plaintiff testified during his deposition that he never asked to be excused from overtime as an accommodation for his PTSD and admits that he could have worked it. Def. SMF at ¶ 43; Goble Dep. at 190. Chief Day was also advised that when Plaintiff found out that another firefighter was going to be held for the overtime since he was refusing to work it, Plaintiff "laughed out loud and said well sucks to be him." Def. SMF at ¶ 45; Day Dep. at 38, 54-55, Exs. 18, 31.

Upon learning about Plaintiff's refusal to holdover for overtime on May 16, Day asked those involved in this incident to summarize what happened in writing. Pl.

SMF at ¶ 31; Day Dep. at 53. Bruce sent Day an email summarizing his recollections of the incident, though Plaintiff was not asked to do this. Pl. SMF at ¶ 32; Day Dep. at 53-54. Day met with Eric Taylor, the City Administrator, and Bolick to discuss the overtime incident. Def. SMF at ¶ 46; Day Dep. at 34-35. According to Day, she was told during the meeting "to terminate [Plaintiff] because there was a long history of issues with this employee and they wanted to just get rid of him." Pl. SMF at ¶ 43; Day Dep. at 63. In addition, Day was told during the meeting about Plaintiff's PTSD diagnosis. Pl. SMF at ¶¶ 44-45; Day Dep. at 67, 70. Taylor told Day to "check about this, about PTSD" and that was "the first [Day] really hear[d] about this diagnosis" or about any requests for reasonable accommodation. Def. Resp. SMF at ¶ 45; Day Dep. at 13, 67-68, 70; Pl. SMF at ¶¶ 38, 50. Day understood the "check about this" comment to mean check the Return to Work Agreement to see whether Plaintiff's conduct violated the Agreement. Def. Resp. SMF at ¶ 45; Day Dep. at 67-70; 102. After the meeting, Bolick sent Chief Day a copy of Plaintiff's Return to Work Agreement. Def. SMF at ¶ 47; Day Dep. at 68-70, 83, Exs. 37, 38; Acree Ex. 15.

Ultimately, Day made the decision to discipline Plaintiff. Pl. SMF at ¶ 37; Day Dep. at 35; Bolick Dep. at 17-18, 157. Chief Day initially wanted to demote Plaintiff, but after speaking with Taylor, who expressed that Plaintiff should be terminated, and reviewing Plaintiff's Return to Work Agreement, which she had not seen before, she

agreed that termination was appropriate. Def. SMF at ¶ 48; Pl. SMF at ¶¶ 41-49; Def Resp. SMF at ¶ 38; Day Dep. at 34-37, 43-44, 58-60, 63, 66-68, 70, 73, 76-77, 84, 103-104, Ex. 44. Day characterized Taylor's directive to fire Plaintiff as "extreme" and indicated she would have demoted Plaintiff, rather than terminating him, absent Taylor's input. Pl. SMF at ¶¶ 46-47; Day Dep. at 76-77. In fact, Day testified that "[t]he biggest impact to change my decision from demotion to separation was the direction I was given from city administration. When I received the documentation, I understood the direction that I was given, and I supported that direction." Def. Resp. SMF at ¶ 49; Day Dep. at 96. Day also testified: "I would not have terminated him. But based on this return-to-work agreement, once I read it, I don't know. I've fired people before because they violated return-to-work agreements. You don't want to fire somebody, but if they can't adhere to the standard, the rules that are set, you have to." Def. Resp. SMF at ¶ 49; Day Dep. at 77.

Bolick testified she "was not aware" that the City Administrator was involved in the decision to terminate the Plaintiff. Def. Resp. SMF at ¶ 38; Bolick Dep. at 18. Further, she testified that Day made the decision to terminate Plaintiff. Def. Resp. SMF at ¶ 38; Bolick Dep. at 157. Day testified that people with disabilities, such as an anxiety disorder, "can't be in the field." Pl. SMF at ¶ 52; Day Dep. at 50. Defendant contends that, read in context, Day's testimony was that unprofessional

conduct could not be accommodated, even when it arises from a disability. Def. Resp. SMF at ¶ 52; Day Dep. at 48-51. Moreover, Day stated that Plaintiff, "unfortunately– and if in fact he did have a clinical diagnosis of post-traumatic stress, he should have not had the responsibility that he had, and really he shouldn't work for the fire department, not because of his post-traumatic stress side, but just because of his behavioral issues. And you just can't behave like that." Def. Resp. SMF at ¶ 53; Day Dep. at 37. Chief Day prepared an initial draft of the termination letter, which was revised by Bolick and then given to Plaintiff. Def. SMF at ¶ 49; Day Dep. at 32-33, 84-85, Exs. 39, 42; Acree Ex. 17. The termination letter states:

> On May 15, 2014 you were informed by . . . Danny Bruce, that you were next up for mandatory overtime. At that time, you were directed to report for the May 16th shift. You outwardly refused. This behavior cannot and will not be tolerated. This is considered insubordination and a direct violation of the City's 'Prohibited Conduct' policy and the 'Conformance to Directives' section contained in your Return to Work Agreement, executed on October 1, 2013. After close review of your personnel file, including prior disciplinary notices/actions, it is my recommendation to terminate your employment with the City of Smyrna and the Fire Department, effective June 17, 2014. You have the right to appeal this proposed adverse action.

Pl. SMF at ¶ 39; Ex. 17.

The Agreement was the first time that Day became aware of Plaintiff's PTSD and anxiety, and Day referenced Plaintiff's PTSD in the initial draft of the termination letter because Plaintiff violated the Agreement, and it "was written because he had

PTSD." Pl. SMF at ¶¶ 50-51; Day Dep. at 13, 92. Day further testified that she referenced the PTSD in her draft letter "[b]ecause the diagnosis didn't matter." Pl. SMF at ¶¶ 50-51; Day Dep. at 92. The letter itself states: "regardless of your diagnosis, your last chance agreement with the City of Smyrna never addressed mandatory overtime. It did, however, address the fact that you understood that insubordination was not tolerated. You directly violated this." Pl. SMF at ¶¶ 50-51; Day Dep. Ex. 39.

Plaintiff appealed Chief Day's recommendation to Taylor in accordance with the City Disciplinary Appeals policy. Def. SMF at ¶ 50; Taylor Decl. at ¶ 5, Ex. C. Taylor met with Plaintiff and his attorney to discuss the proposed termination. Def. SMF at ¶ 51; Taylor Decl. at ¶ 5, Ex. C. Taylor then met with Battalion Chief Bruce. Def. SMF at ¶ 52; Taylor Decl. at ¶ 8. He also reviewed Plaintiff's Return to Work Agreement and documents in Plaintiff's personnel file, including prior reprimands for insubordination and documentation of Plaintiff's history of inappropriate and unprofessional interactions with fellow employees. Def. SMF at ¶ 53; Taylor Decl. at ¶ 6, Exs. D-R. After completing his investigation, Taylor adopted Chief Day's recommendation and terminated Plaintiff's employment on June 19, 2014, for violating his Return to Work Agreement, as well as Smyrna's "Prohibited Conduct" policy, which prohibits insubordination and various forms of rude and disrespectful

conduct. Def. SMF at ¶ 54; Taylor Decl. at ¶¶ 10-11, Ex. T. Plaintiff did not appeal his termination. Def. SMF at ¶ 55; Taylor Decl. at ¶ 11. On July 9, 2014, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") more than 180 days after the fitness for duty evaluation in 2013. Def. SMF at ¶ 56; Goble Dep. at 202-203, Ex. 22.

While Plaintiff had a history of insubordination and inappropriate social interactions with co-workers, Smyrna was unaware of Plaintiff's PTSD prior to his disclosure in July 2013. Def. SMF at ¶ 58; Acree Dep. at 13-14, 28-32, Ex. 23; Acree Decl. at ¶¶ 4-5, 8, 10, Ex. B-C. Plaintiff also had a history of performance appraisals that Plaintiff contends demonstrate that he was a successful employee. *See* Pl. Resp. SMF at ¶ 58; Day Dep. at 22 (Goble "looks like a good employee on paper" and "uses judgment based on years of experience. He is able to handle stressful situations with no problems"). Day had not seen these appraisals at the time she chose to discipline Plaintiff. Def. Resp. SMF at ¶ 2; Day Dep. at 11, 18. Plaintiff further contends that he was only occasionally subject to disciplinary actions and that Day did not take either of two written reprimands into account when she chose to discipline Plaintiff. Pl. Resp. SMF at ¶ 58; Day Dep. at 25-26.

According to Plaintiff's performance evaluations, Plaintiff "met expectations" in the areas of decision making, appropriate appearance, dress, conduct, and physical

fitness during the July 2009-June 2010 period.[2] Pl. SMF at ¶ 3; Ex. 3. Moreover, Plaintiff "exceeded expectations" in the area titled "working under stressful conditions." Pl. SMF at ¶ 4; Ex. 3 at 8. Plaintiff's performance evaluation for the following year was similar, and he received an overall rating of 3.1 out of 5. Pl. SMF at ¶ 5; Ex. 4 at 2. Furthermore, Plaintiff was rated "successful" with a score of 3 out of 5 during the 2011-2012 period. Pl. SMF at ¶ 6; Ex. 5. Finally, Plaintiff's June 2013 appraisal, which was issued just prior to the disclosure of his PTSD, stated that he "uses judgment based on years of experience" and "is able to handle stressful situations with no problems." Pl. SMF at ¶ 7; Day Dep. at 22; Ex. 6. This evaluation was signed off on by Chief Acree and Kay Bolick, the Director of Human Resources. Pl. SMF at ¶ 8; Day Dep. at 24.

Acree testified that Plaintiff's "[o]n-scene performance, fire ground performance" never raised "any issues" and that Plaintiff "was, the whole time he was a lieutenant when we were on the fire scene which is not that common, on the EMS scene, always professional, always did a great job." Pl. SMF. at ¶ 1; Acree Dep. at 13-14. Acree went on to testify that "[t]here were some issues when we were not on the

---

[2]Defendant contends that this, and the evaluations from 2010-2012, are irrelevant because Plaintiff's performance in 2009 and 2010 is immaterial to whether he was a qualified individual with a disability in 2013 and 2014, when his PTSD had gotten progressively worse since his diagnosis in 2011. Def. Resp. SMF at ¶¶ 3-6; Goble Dep. at 111-12.

scene. There were issues with just being able to interact professionally with not our customers but internally with employees." Def. Resp. SMF at ¶ 1; Acree Dep. at 14.

The ability to work cooperatively within a chain of command, receive advice and direction from superiors, communicate and get along with others, maintain emotional stability, and manage stress are essential functions of Plaintiff's job as a fire lieutenant. Def. SMF at ¶ 59; Pl. Resp. SMF at ¶ 59; Day Dep. at 78-79, Ex. 15; Acree Decl. at ¶ 11; Goble Dep. at 78-79, 84, Ex. 7. Plaintiff acknowledges the necessity of having a chain of command in the fire service and the important safety purpose that it serves. Def. SMF at ¶ 60; Pl. Resp. SMF at ¶ 60; Goble Dep. at 73-76. Plaintiff's PTSD substantially impairs his ability to communicate and interact with his environment, manage stress, exercise impulse control, and process his emotions. Def. SMF at ¶ 61; Pl. Resp. SMF at ¶ 61; Goble Dep. Ex. 4 at ¶ 9; Blue Dep. at 85-86, 112-13. Dr. Blue confirmed that Plaintiff has issues with impulse control and taking directives from his superiors at work, and his symptoms of anger and rage are triggered through his interactions with his superiors.[3] Def. SMF at ¶ 62; Blue Dep. at 30-32, 42-46, 86-87, 95. As examples, in 2009 Plaintiff complained to the Chief about

---

[3]Plaintiff disputes the materiality of this fact because Dr. Blue's confirmation was not known to Defendant at the time Plaintiff was fired. Pl. Resp. SMF at ¶ 62. However, the fact is material in determining whether Plaintiff was a qualified individual, and the Court considers it for purposes of that analysis.

an evaluation because he thought his supervisor was using it as a "form of control or harassment for future punishments and/or termination." Def. SMF at ¶ 63; Goble Dep. at 118-120, Ex. 14. On another occasion, he complained to then-Deputy Chief Acree about a verbal counseling he received for nodding off in a training class because he thought his Battalion Chief was "constantly berating" and "harassing" him.[4] Def. SMF at ¶ 64; Goble Dep. at 61-62; 86-89.

Plaintiff can perceive almost any remark as critical, which leads to a feeling of constant harassment. Def. SMF at ¶ 65; Goble Dep. at 141. When triggered, Plaintiff's PTSD reduces his "ability to cope and handle situations where people [tell] him what to do." Def. SMF at ¶ 66; Blue Dep. at 112-13. Dr. McElroy concluded that Plaintiff's condition creates limitations for him in the workplace, including an "inability to appropriately handle conflict and a tendency to exhibit emotionally inappropriate behavior. As a result, it is difficult for him to conform to the behavioral standards of the department and the requirements of his position." Def. SMF at ¶ 68; Acree Dep., Ex. 14. Dr. Blue agreed with Dr. McElroy's assessment. Def. SMF at ¶ 69; Blue Dep. at 123-24, Ex. 3. Even when Plaintiff's supervisors communicated work-related,

[4]Plaintiff objects to both proffered examples inasmuch as Defendant intends to use them to illustrate Plaintiff's PTSD because there is no evidence in the record that these incidents stemmed from Plaintiff's PTSD. Pl. Resp. SMF at ¶¶ 63-64. Though not necessarily linked to Plaintiff's PTSD, the Court considers these incidents in assessing Plaintiff's ability to work with others and listen to his superiors.

essential information, such as information on an evaluation or reminding Plaintiff of the proper dress code, he became angry. Def. SMF at ¶ 73; Goble Dep. at 61-63. Moreover, Dr. Blue testified that Smyrna could not do anything to accommodate Plaintiff's PTSD symptoms– other than place him in a situation where he would not be made upset. Def. SMF at ¶ 70; Blue Dep. at 95-96, 115, 124-25. Dr. Blue said that the best way to accomplish this would be to instruct Plaintiff's superiors to "leave him alone" and not give him instruction.[5] Def. SMF at ¶ 70; Blue Dep. at 95-96, 115, 124-25.

Plaintiff waited to disclose his PTSD until June 2013 because it had been getting worse, there was an "anger brewing," and he did not want to get pushed to a point where he did something he regretted, such as hitting somebody or cussing them out "to the point where there's no going back." Def. SMF at ¶ 74; Goble Dep. at 112-13. Plaintiff described to Dr. Blue what it felt like when he got angry, including feelings like: "I'm going to beat his fucking ass."[6] Def. SMF at ¶ 75; Blue Dep. at 74.

---

[5]Plaintiff objects to this fact as immaterial because Dr. Blue's opinion was not relied upon by Defendant when it determined what accommodations it would offer Plaintiff or when it terminated him. However, the Court overrules the objection and considers this fact for the sole purpose of assessing whether Plaintiff was a qualified individual.

[6]Plaintiff objects to this fact as immaterial. Pl. Resp. SMF at ¶ 75. However, the Court overrules this objection and considers this fact for the limited purpose of determining whether Plaintiff is a qualified individual under the ADA and Rehabilitation Act.

Plaintiff perceives injustices where others might not and reacts irrationally.[7] Def. SMF at ¶ 76; Blue Dep. at 76.

Plaintiff's PTSD symptoms, and his anger specifically, were reduced while he was taking his prescribed medication. Def. SMF at ¶ 79; Blue Dep. at 74. Dr. Blue agreed that requiring a commitment from Plaintiff to control his anger or be subject to discipline provided Plaintiff an incentive not to lose control. Def. SMF at ¶ 80; Blue Dep. at 135-36. The fact that the existing requirements of Plaintiff's position were explicit in the Return to Work Agreement was because those were the issues that Plaintiff had been having trouble with and the job requirements that were impacted by Plaintiff's PTSD. Def. SMF at ¶ 81; Acree Dep. at 69-70.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes*

[7]Though Plaintiff objects to the materiality of the previous two facts, Pl. Resp. SMF at ¶¶ 75-76, the Court deems them material for purposes of determining whether Plaintiff was a qualified individual.

*v. S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249; *Ryder Int'l Corp. v. First American Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). Rather, the court only determines whether there are genuine issues of material fact to

be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Anderson*, 477 U.S. at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id.*

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *Id.* An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 242. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259.

B. PLAINTIFF'S CLAIMS

In the Complaint, Plaintiff asserts claims under the ADA and the Rehabilitation Act. Compl. [1] at ¶¶ 27-35. Plaintiff does not clearly articulate his individual claims, but in "Count I" he appears to assert the following claims under the ADA: (1) failure to reasonably accommodate his disability by refusing to allow Plaintiff not to work overtime; (2) retaliation for requesting a reasonable accommodation in the form of not working overtime; (3) disability discrimination in the form of termination; and (4) a violation of section 12112(d)(4) of the ADA by forcing Plaintiff to undergo a fitness for duty examination as a condition of his continued employment. *Id.* at ¶¶ 30-31. Plaintiff claims that, under the ADA, he is a qualified individual with a disability, and that Defendant subjected Plaintiff to onerous conditions of employment based on his record of disability, that Defendant placed numerous non-work-related conditions on Plaintiff's continued employment on account of his disability, and ultimately terminated Plaintiff on pretextual grounds. *Id.* at ¶¶ 28-29. In "Count II" Plaintiff sets out alleged violations of the Rehabilitation Act. Plaintiff claims that these alleged violations, including (1) Defendant's "requirement that Plaintiff undergo testing; (2)[Defendant's] imposition of punitive terms for his return to work; (3) [Defendant's] refusal to accommodate [Plaintiff's] disability; and (4) [Defendant's] termination of

Plaintiff's employment, constitute discrimination on the basis of his disability, and retaliation in violation of the Rehabilitation Act." *Id.* at ¶ 35.

1. *Standards of Proof under the ADA and Rehabilitation Act*[8]

The ADA was "designed to prohibit discrimination against disabled persons and enable those persons 'to compete in the workplace and the job market based on the same performance standards and requirements expected of persons who are not disabled.'" *Paleologos v. Rehab Consultants, Inc.*, 990 F. Supp. 1460, 1464 (N.D. Ga. 1998) (quoting *Harding v. Winn-Dixie Stores, Inc.*, 907 F. Supp. 386, 389 (M.D. Fla. 1995)). Title I of the ADA prohibits covered employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see also Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001).

---

[8]The standards set forth below are equally applicable to the ADA and the Rehabilitation Act. The Court analyzes Plaintiff's Rehabilitation Act claims together with Plaintiff's ADA claims because discrimination claims brought under the Rehabilitation Act are governed by the same standards as claims brought under Title I of the ADA. *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 n.2 (11th Cir. 1997); *see also Boone v. Rumsfeld*, 172 F. App'x 268, 270 (11th Cir. 2006).

The definition of "discriminate" includes a failure to make reasonable accommodations to the limitations of that individual with a disability. 42 U.S.C. § 12112(b)(5)(A) ("the term 'discriminate against a qualified individual on the basis of disability' includes . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.").

In general, the burden of proof for a claim of disability discrimination under the ADA is based on the framework established by the Supreme Court for Title VII employment discrimination cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000) (*McDonnell Douglas* framework generally applies to disability discrimination claims under the ADA). For those cases in which an employee claims that an employer violated the ADA by failing to provide a reasonable accommodation for the employee's disability, however, the Eleventh Circuit has held that the *McDonnell Douglas Corp.* burden-shifting framework does not apply. *Nadler v. Harvey*, 2007 WL 2404705, at *9 (11th Cir. August 24, 2007) ("An employer *must* reasonably accommodate an otherwise qualified employee with a *known* disability unless the accommodation would impose

an undue hardship in the operation of the business. . . . Thus, applying *McDonnell Douglas* to reasonable accommodation cases would be superfluous, since there is no need to prove discriminatory motivation.") (emphasis in original); *see also Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1262 (11th Cir. 2007) (in an ADA failure to accommodate case, there are no additional burdens on defendant to show that it had a legitimate nondiscriminatory reason for terminating plaintiff or on plaintiff to establish that defendant's proffered reasons were pretextual); *Jones v. Georgia Dep't of Corrections*, 2008 WL 779326, *6 (N.D. Ga. March 18, 2008) ("The Eleventh Circuit came to the logical conclusion that the *McDonnell Douglas* test does not apply to reasonable accommodation claims in [*Nadler*], but it inexplicably did not publish the opinion and provide trial courts with a clear answer to this previously unaddressed issue.").

2. *Plaintiff's Claims for Failure to Accommodate, Illegal Fitness Testing, and Retaliation*

After the Defendant filed its motion for summary judgment, Plaintiff filed a response brief, in which he states that he "has elected not to pursue claims that he was subjected to illegal testing or that he was denied a reasonable accommodation." Pl. Br. [52] at 2 n.1. Accordingly, Plaintiff has conceded that two of his claims under the ADA and Rehabilitation Act should not go forward. Moreover, Plaintiff's response brief does not contain any evidence or argument in support of his claims of retaliation,

and therefore the Court deems that claim abandoned. *See White v. City of Lagrange, Ga.*, 952 F. Supp. 2d 1353, 1357 (N.D. Ga. 2013) (explaining that if, in response to a defendant's motion for summary judgment on a particular count, the plaintiff fails to present evidence or argument in support of that count, the Court may deem that claim abandoned), *aff'd*, 538 F. App'x 892 (11th Cir. 2013)); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned."); *Resolution Trust Corp. V. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

Therefore, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [44] be **GRANTED** as to Plaintiff's ADA and Rehabilitation Act claims that allege (1) retaliation, (2) failure to accommodate, and (3) illegal fitness-for-duty testing.

Plaintiff's remaining claims, for disability discrimination under the ADA and Rehabilitation Act, allege that Defendant discriminated against Plaintiff on the basis of his disability by requiring his consent to the Return to Work Agreement and by subsequently terminating Plaintiff's employment based on that Agreement and for pretextual reasons. Pl. Br. [52] at 2.

3. *Plaintiff's Claims of Disability Discrimination*

Plaintiff alleges that Defendant required that he sign a Return to Work Agreement because of his alleged disability, PTSD. Plaintiff further alleges that Defendant terminated him under the pretext that it was because he had violated that same Return to Work Agreement– when in reality, Defendant fired him because of his disability. Plaintiff's Complaint did not clearly indicate that he intended to bring two separate disability discrimination claims, but in Plaintiff's response brief, he argues that Defendant discriminated against him based on his disability in two "discrete" ways: first, by insisting Plaintiff sign a Return to Work Agreement with content Plaintiff alleges was punitive and targeted his PTSD symptoms, and second, by terminating Plaintiff based on his disability, using the Return to Work Agreement as a pretextual justification. *See* Pl. Br. [52] at 18. Therefore, the Court analyzes both claims separately below.

To establish a *prima facie* case of disability-based discrimination under the ADA, a plaintiff must demonstrate that he: (1) has a disability as defined in the ADA, (2) is a "qualified individual," meaning that, with or without reasonable accommodations, he can perform the essential functions of the job he holds; and (3) was discriminated against because of his disability. *See Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014) (citing *Holly*, 492 F.3d

at 1256); *Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007); *Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1369 (11th Cir.1998). In addition, a plaintiff must present evidence establishing that his employer had either actual or constructive knowledge of his alleged disability or considered him to be disabled. *See Gordon v. E.L. Hamm & Assoc., Inc.*, 100 F.3d 907, 910-911 (11th Cir. 1996); *Morisky v. Broward County*, 80 F.3d 445, 447-48 (11th Cir. 1996).

If Plaintiff were to show a *prima facie* case of discrimination with regard to his termination, the burden would shift to Defendant to show a legitimate, non-discriminatory reason for the termination. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004). The burden would then shift back to Plaintiff to "demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination." *See Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997).

As explained below, Plaintiff has failed to make a *prima facie* showing of disability discrimination with regard to his termination or the Return to Work Agreement, so Defendant's Summary Judgment Motion should be granted in its entirety.

a. Plaintiff's *Prima Facie* Case

The first *prima facie* element requires the Plaintiff to show that he has a disability as it is defined under the ADA. The relevant provision of the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). In addition, the ADA Amendments Act of 2008 ("ADAAA") amended the ADA in 2008 to further provide that, for the purpose of establishing the existence of a "disability," "a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B).[9]

For purposes of its summary judgment motion, Defendant does not appear to contest that Plaintiff can adduce at least a triable issue of fact as to the first element of a claim of disability discrimination, *i.e.*, that Plaintiff suffered from a disability for purposes of the ADA and Rehabilitation Act. Rather, Defendant's argument focuses on the second and third elements– that Plaintiff was not a qualified individual for

[9] The ADA was amended by the ADAAA in 2008, and the amendments became effective on January 1, 2009. *See Dickey v. Dollar Gen. Corp.*, No. 08–15901, 2009 WL 3497733, *1 n.3 (11th Cir. Oct. 30, 2009).

purposes of the ADA and Rehabilitation Act and that Plaintiff was not discriminated against on the basis of his disability.

The second element of the *prima facie* case requires the Plaintiff to establish that he is a "qualified individual." 42 U.S.C. § 12112(a). The ADA defines the term "qualified individual" as follows:

> The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8).

"Accordingly, an ADA plaintiff must show either that he can perform the essential functions of his job without accommodation, or, failing that, show that he can perform the essential functions of his job with a reasonable accommodation." *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1229 (11th Cir. 2005) (citation and internal quotation marks omitted). "Courts consider the employer's judgment regarding whether a function is essential, as well as (1) the amount of time spent on the job performing the function, (2) the consequences of not requiring the individual to perform the function, (3) the terms of a collective-bargaining agreement, (4) the work experience of individuals who held the job in the past, and (5) the work

experience of individuals currently in similar jobs." *Anderson v. Embarq/Sprint*, 379 F. App'x 924, 927-28 (11th Cir. 2010) (citing *Holly*, 492 F.3d at 1257-58). If a plaintiff cannot perform an essential function of his job, even with a reasonable accommodation, then he is not a "qualified individual" and is unable to establish a *prima facie* case. *See Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000). Moreover, "[a]n employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of *any* position." *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002) (emphasis added). "Absence of such skills prevents the employee from being 'otherwise qualified.'" *Id.* at 1290-91.

Defendant argues that Plaintiff is not a qualified individual because he cannot perform essential functions of his position. In particular, Defendant notes that the "ability to work cooperatively within a chain of command, receive advice and direction from superiors, communicate and get along with others, maintain emotional stability, and manage stress" are essential functions of Plaintiff's job as a fire lieutenant. Def. SMF at ¶ 59; Day Dep. at 78-79, Ex. 15; Acree Decl. at ¶ 11; Goble Dep. at 78, 79, 84, Ex. 7. Plaintiff admits that those are essential functions of the job. Def. SMF at ¶ 59; Pl. Resp. SMF at ¶ 59. Plaintiff also acknowledges the necessity of having a chain of command in the fire service and the important safety purpose it serves. Def. SMF at ¶ 60; Goble Dep. at 73-76. Furthermore, Plaintiff admits that his

"PTSD substantially impairs his ability to communicate and interact with his environment, manage stress, exercise impulse control, and process his emotions." Def. SMF at ¶ 61; Goble Dep. Ex. 4 at ¶ 9. Plaintiff admits that he can perceive almost any remark as critical, which leads to a feeling of constant harassment. Def. SMF at ¶ 65; Goble Dep. at 141. Moreover, Plaintiff's doctor, Dr. Blue, confirmed that Plaintiff's issues with impulse control and taking direction from his superiors at work, along with his symptoms of anger and rage, are triggered through interactions with his superiors. Def. SMF at ¶ 62; Blue Dep. at 30-32, 42, 46, 86-87, 95.[10] Plaintiff admits that "[w]hen triggered, [his] PTSD reduces his 'ability to cope and handle situations where people [tell] him what to do.'" Def. SMF at ¶ 66; Blue Dep. at 112-13. Plaintiff also did not refute Dr. McElroy's conclusion that Plaintiff's condition creates limitations

---

[10]Though Plaintiff objects to Dr. Blue's testimony as immaterial, because his opinions were not known to Defendant at the time of Plaintiff's termination, Dr. Blue's testimony is material in determining whether Plaintiff was a qualified individual. As such, the Court overrules Plaintiff's objection and considers Dr. Blue's testimony for the purpose of assessing whether Plaintiff was a qualified individual under the ADA and Rehabilitation Act.

Moreover, it was known to Defendant at the time of termination that Dr. Blue assessed Plaintiff as having "severe symptoms of anger and rage along with severe depression," and that he recommended Plaintiff not work *at all* and be placed on "full disability." Def. SMF at ¶¶ 14, 15. It was only because of a perception of Smyrna's inadequate insurance that Dr. Blue indicated Plaintiff would be returning to work, apparently despite being considered fully disabled. In other words, Defendant knew that Dr. Blue's medical recommendation was that Plaintiff not work at all and be considered fully disabled.

for him in the workplace, including an "inability to appropriately handle conflict and a tendency to exhibit emotionally inappropriate behavior. As a result, it is difficult for him to conform to the behavioral standards of the department and the requirements of his position." Def. SMF at ¶ 68; Acree Dep. Ex. 14. Finally, Plaintiff does not refute Dr. Blue's agreement with this assessment. Def. SMF at ¶ 69; Blue Dep. at 123-24, Ex. 3. Indeed, Dr. Blue's medical judgment was that Plaintiff needed to be placed on "full disability." Bolick Dep. at 32-33. Dr. Blue stated that Plaintiff needed to return to work despite that assessment because of inadequacies in his insurance coverage otherwise. Notably, Dr. Blue offered no information at any time suggesting Plaintiff could actually perform specific tasks and, to the contrary, his opinion that Plaintiff needed to be placed on "full disability" suggests otherwise.

Plaintiff's admissions and failure to refute the evidence showing that Plaintiff is substantially impaired in his ability to work cooperatively within a chain of command, take advice and direction from superiors, communicate and get along with others, maintain emotional stability, and manage stress– all of which Plaintiff admits are essential functions of his job– establish that Plaintiff is not a qualified individual. Although Plaintiff asserts that "the record of Goble's performance is at odds with this assessment," he never points to anything in the record that establishes that as fact. Plaintiff's argument that he never had any trouble performing his job while actually

on site, along with the argument that he had positive annual evaluations, do not counter the fact that he has admitted that his PTSD impaired his ability to perform essential functions of his job.

Defendant does not argue that Plaintiff cannot ever perform parts of his job adequately or that he had not done so in the past; rather, Defendant's argument is that Plaintiff's acknowledged inability to manage stress, maintain emotional control, and follow the directions of his superiors amount to an inability to reliably perform the essential functions of his job going forward. Said another way, simply because Plaintiff's inability to control emotions, handle stress, or follow commands had not manifested itself in actual problems or dangerous incidents in the field does not mean that Plaintiff was "qualified." In a public safety position such as this, Smyrna must have the leeway to deem these abilities as essential and terminate someone who cannot perform them *before* the inabilities result in injuries or other disasters. Here, it is dispositive that (1) Plaintiff admits these abilities are essential to the job and (2) that he is substantially impaired in performing them.

Nor has Plaintiff identified any reasonable accommodation that would have enabled him to perform the essential functions at issue. Dr. Blue testified that Smyrna could not do anything to accommodate Plaintiff's PTSD symptoms– other than place him in a situation where he would not be made upset. Def. SMF at ¶ 70; Blue Dep. at

95-96, 115, 124-25. Dr. Blue said that the best way to accomplish this would be to instruct Plaintiff's superiors to "leave him alone" and not give him instruction.[11] Def. SMF at ¶ 70; Blue Dep. at 95-96, 115, 124-25. This approach is not a reasonable accommodation because it discounts the necessity of following the directions of superiors, which Plaintiff admits to be an essential function of the job. Without being asked, Acree attempted to accommodate Plaintiff by asking him if he would feel less stressed out if he were to drive the truck. However, Plaintiff declined the offered accommodation because he believed it was an "insult." Although Plaintiff at one point discusses that he should have been accommodated by not being made to work overtime and that his supervisor should have refrained from speaking to him unless the communication was "essential," Acree Dep. Ex. 13, he puts forth no evidence to support the fact that not working overtime would have allowed him to perform the essential functions of his job. In addition, Plaintiff admits that he never requested any accommodations with regard to working overtime. Indeed, the Court is left with no medical evidence or any other information to support an inference that merely

[11]Plaintiff objects to this fact as immaterial because Dr. Blue's opinion was not relied upon by Defendant when it determined what accommodations it would offer Plaintiff or when it terminated him. However, the Court overrules the objection and considers this fact for the sole purpose of assessing whether Plaintiff was a qualified individual.

exempting Plaintiff from overtime assignments would address his fundamental limitations in handling stressful situations or in accepting supervision or direction.

Nor does Plaintiff show that excusing overtime– and thereby necessarily forcing Defendant to shift this burden disproportionately on all other firefighters– was reasonable. *See Treadwell v. Alexander*, 707 F.2d 473, 478 (11th Cir. 1983) (finding that an accommodation in the nature of assigning additional workers from a limited staff to perform plaintiff's duties was an undue burden the employer need not undertake); *Gilbert v. Frank*, 949 F.2d 637, 644 (2d Cir. 1991) (finding that assigning other postal employees to do the plaintiff's heavy work was not a reasonable accommodation); *Stubbs v. Marc Center*, 950 F. Supp. 889, 895 (C.D. Il. 1997) (finding that Plaintiff's "attempted accommodation to temporarily shift his duties to his co-workers and subordinates is unreasonable as a matter of law"); *Reigel v. Kaiser Foundation Health Plan of North Carolina*, 850 F. Supp. 963, 973 (E.D.N.C. 1994) ("courts have universally found that employers are not required to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability.").

Nor would requiring Plaintiff's superiors to only speak with him if the communication were "essential" necessarily allow Plaintiff to perform the essential functions of his job. In fact, the very nature of this suggested accommodation

contradicts the idea that Plaintiff could perform the essential functions of his job– in the form of communicating with and listening to his superiors. Moreover, Dr. Blue was never able to explain what would constitute an essential communication, as opposed to one that was not essential, within the context of Plaintiff's position with the fire department. Def. SMF at ¶ 72; Blue Dep. at 110-11. And the record illustrates that even when Plaintiff's superiors communicated work-related information, which might be deemed "essential," such as information about an evaluation or the proper dress code, Plaintiff became angry. Def. SMF at ¶ 73; Goble Dep. at 61-63. As such, Plaintiff has put forth no evidence to support the claim that he was a qualified individual under the ADA, and the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment be **GRANTED** as to Plaintiff's disability discrimination claims under the ADA and Rehabilitation Act on those grounds.[12]

The third and final element of the Plaintiff's *prima facie* case requires him to establish that he was discriminated against because of his disability. *See Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014) (citing *Holly*, 492 F.3d at 1256); *Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263

[12] Although the Court has recommended that Defendant's Motion for Summary Judgment be granted in its entirety at this point, in case a reviewing court disagrees with the assessment that Plaintiff is not a qualified individual, the Court analyzes the third element of Plaintiff's *prima facie* claim, below.

(11th Cir. 2007). Plaintiff must show that he "suffered an adverse employment action and that [his] disability was the determining factor in [his] termination." *Haines v. Cherokee County*, 2010 WL 2821853, at *16 (N.D. Ga. Feb. 16, 2010). Plaintiff alleges that Defendant discriminated against him because of his PTSD in two "discrete adverse actions": first, by requiring that he sign a Return to Work Agreement as a condition of his continued employment, and second, by terminating his employment. Pl. Br. [52] at 18. Defendant argues that Plaintiff has not put forth evidence to support a finding that Defendant discriminated against Plaintiff *because of* his PTSD– as required by the ADA and the Rehabilitation Act. *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008). The ADA requires only that the Plaintiff show his disability was the "but for" cause of the adverse action, *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1073-74 (11th Cir. 1996), and the Rehabilitation Act requires a more rigorous showing that Plaintiff was discriminated against "*solely* by reason of . . . his disability." 29 U.S.C. § 794(a) (emphasis added).

(1) Return to Work Agreement

Plaintiff argues that the Return to Work Agreement violates the ADA and Rehabilitation Act because the terms of the Agreement required that he meet a "heightened standard of performance" and because the Agreement was "couched as

a disciplinary action based on [Plaintiff's] history of poor performance." Pl. Br. [52] at 18.

Defendant first argues that Plaintiff's ADA claim with regard to the Return to Work Agreement should be dismissed because Plaintiff did not timely file his EEOC charge.[13] Def. Reply Br. [53] at 7 n.8. A plaintiff must file an EEOC charge within 180 days of the allegedly unlawful employment practice in order to later bring suit under the ADA, 42 U.S.C. § 12117(a). This issue is of limited practical significance since the Rehabilitation Act does not require the exhaustion of administrative remedies in actions against non-federal employers. *Morales v. Ga. Dep't of Human Res.*, 446 F. App'x 179, 181 (11th Cir. 2011). In this case, Plaintiff entered into the Return to Work Agreement on October 1, 2013. He did not file his EEOC claim until July 9, 2014, more than 180 days after he signed the Agreement. Def. SMF at ¶ 39; Goble Dep. at 202-203, Ex. 22. Therefore, the Court agrees with Defendant that Plaintiff's ADA claim, although not the Rehabilitation Act claim, based on the Return

[13]Defendant did not make this argument in its Motion for Summary Judgment because Plaintiff did not make clear that he intended to pursue a separate claim for disability discrimination based solely on the Return to Work Agreement. However, Defendant did make this argument regarding Plaintiff's claim that he was subjected to an unlawful fitness for duty exam. Though Plaintiff is no longer pursuing that claim, and although Defendant did not make this argument in its opening brief, Defendant argues in its reply brief that the same law applies. The Court agrees.

to Work Agreement would not survive summary judgment even if Plaintiff had demonstrated that he was a qualified individual.

Next, Defendant contends that the Agreement was not a form of disability discrimination and that it was neither punitive nor did it require that Plaintiff be subject to any standards of performance that he was not already subject to as an employee. Return to work agreements, "by their nature, impose employment conditions different from those of other employees." *Longen v. Waterous Co.*, 347 F.3d 685, 689 (8th Cir. 2003). "Employers do not violate the ADA merely by entering into return-to-work agreements that impose employment conditions different from those of other employees." *Ostrowski v. Con-Way Freight, Inc.*, 543 F. App'x 128, 131 (3d Cir. 2013); *see also Brock v. Lucky Stores, Inc.*, 23 F. App'x 709, 712 (9th Cir. 2001); *McKey v. Occidental Chemical Corp.*, 956 F. Supp. 1313, 1318-19 (S.D. Tex. 1997). Moreover, courts do not uniformly treat return to work agreements that regulate conduct associated with a disability as forms of disability discrimination. *See, e.g., Ostrowski*, 543 F. App'x at 131.

*Ostrowski v. Con-Way Freight, Inc.*, 543 F. App'x 128, 131 (3d Cir. 2013), is particularly instructive. In *Ostrowski*, the plaintiff alleged disability discrimination against his employer because he had to sign a return to work agreement in order to continue his employment. In that case, the plaintiff was an alcoholic, and his return

to work agreement regulated his conduct with regard to consumption of alcohol. *Id.* Differentiating between the plaintiff's disability (alcoholism) and regulation of his conduct (drinking alcohol), the *Ostrowski* court found that enforcing a return to work agreement did not constitute disability discrimination because it did not "restrict the ability of individuals who suffer from alcoholism to work" for them. Instead, it "simply prohibit[ed] employees subject to its terms from consuming alcohol." *Id.* Similarly, the Ninth Circuit held that the notion that return to work agreements, which "by their nature [] impose employment conditions different from those of other employees," could not be enforced because they violate the ADA by treating some employees differently from others should be rejected. *Brock*, 23 F. App'x 709 at 712.

In this case, Smyrna relies upon *Ostrowski* to show that it did not discriminate against Plaintiff based on his disability. Instead, Defendant contends, Plaintiff voluntarily entered into the Agreement, and Defendant allowed Plaintiff to return to work. The Agreement itself was meant to regulate Plaintiff's conduct at work, not to discriminate against him because of his PTSD. The reasoning in *Ostrowski* is directly applicable here.

It is undisputed that Dr. McElroy conducted a fitness-for-duty evaluation of Plaintiff and found that Plaintiff was not psychologically fit for duty. Def. SMF at ¶ 34; Acree Dep. Ex. 14. Further, there is no dispute that Plaintiff's treating doctor

said that his "original recommendation" was that Plaintiff should "be placed on full disability" but that Plaintiff did not have any other option "but to return to work." Def. SMF at ¶¶ 15-16; Bolick Dep., Ex. 10. It is also undisputed that Dr. McElroy prepared and presented the Return to Work Agreement to Plaintiff, and that the Agreement contained conditions that Dr. McElroy believed would allow Plaintiff to safely and effectively continue to work in his position despite the limitations that both sides agree severely impacted Plaintiff's abilities to engage in essential tasks. Def. SMF at ¶¶ 34-46; Pl. Resp. SMF at ¶¶ 34-46.

Therefore, insofar as this document required Plaintiff to comply with his prescribed treatments, such requirements were a reasonable attempt to solve the problem that Defendant was presented with, that is, a firefighter otherwise deemed unfit for duty. Essentially, these requirements were *conditions* to allow Plaintiff to remain employed despite his disorder and the lack of any evident accommodations. Indeed, in these circumstances, Defendant could have terminated Plaintiff's employment without violating the ADA. But Defendant did not do so, and instead allowed him to remain employed, subject to conditions that he comply fully with prescribed treatment and otherwise conform to the conditions expected of all employees. By definition, therefore, this Return to Work Agreement was not punitive, but rather a freely entered-into agreement in which Plaintiff agreed to some new

restrictions in exchange for “valuable consideration– *i.e.*, that he would not be terminated.” *Longen*, 347 F.3d 685, 689.

Thus, the Return to Work Agreement was not the result of unlawful discrimination but, rather, based on a legitimate non-discriminatory reason, that is, to allow for conditions to allow an employee otherwise unfit to work to remain employed. *See id.* (enforcing return-to-work agreement because any new “additional restrictions were not gratuitous. Because of them, Longen was able to continue working at Waterous. Thus, Longen has not shown that the ADA forbids such agreements”).

Plaintiff’s contention, that he was put on the Return to Work Agreement only because he had voluntarily disclosed his PTSD, and not because of any behavioral issues or disciplinary action, is disingenuous. While it is true that Plaintiff voluntarily disclosed his PTSD, he only did so after receiving a negative performance evaluation. That negative evaluation was changed and made positive to account for his PTSD. Moreover, Plaintiff was not asked to sign the Agreement simply upon disclosure of his PTSD, but, rather, only after Dr. McElroy adjudged him to be unfit for work. The Agreement included conditions specifically set by Dr. McElroy to allow Plaintiff to hopefully continue to work safely and effectively.

Thus, as to Plaintiff's disability discrimination claim based on the Return to Work Agreement, Plaintiff has failed to provide sufficient evidence to support a *prima facie* case, and Defendant's Motion for Summary Judgment as to those claims would be granted on this basis, even if Plaintiff had shown he was a qualified individual.

(2) Termination

Plaintiff argues that Defendant's decision to terminate him was because of his PTSD, and therefore constituted disability discrimination. In particular, Plaintiff points to the fact that Chief Day decided to terminate Plaintiff only after learning about his PTSD and reading the Return to Work Agreement. Pl. Br. [52] at 22-23. Defendant contends that Plaintiff has failed to proffer sufficient evidence to show that he was terminated *because of* his PTSD, as required by the ADA and Rehabilitation Act. Defendant claims that Plaintiff was terminated because of his disciplinary violation and the fact that he could not comply with his Return to Work Agreement and Defendant's Prohibited Conduct policy. Def. Br. [44-2] at 23.

A "plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired him but for his actual or perceived disability." *Savage v. Secure First Credit Union*, 107 F. Supp. 3d 1212, 1217 (N.D. Ala. 2015). Moreover, to establish a claim for disability discrimination under the Rehabilitation Act, a plaintiff must show that the discrimination occurred "solely by

reason of . . . his disability." *Booth v. Houston*, 58 F. Supp. 3d 1277, 1288 n.5 (M.D. Ala. 2014). Once a defendant articulates a legitimate, non-discriminatory reason for the termination, Plaintiff must show that the reason is pretext for unlawful disability discrimination. *See Cusick v. Yellowbook, Inc.*, 2014 WL 949947 at *3 (N.D.Ga. Mar. 11, 2014).

In this case, Plaintiff has made out a *prima facie* case that he would not have been terminated but for his PTSD. The record reflects that Chief Day had initially decided to demote Plaintiff, but changed her mind after meeting with Bolick and Taylor and reviewing the Return to Work Agreement. Pl. SMF at ¶ 47; Day Dep. at 77. During the meeting, Eric Taylor, the City Administrator, told Day to terminate Plaintiff "because there was a long history of issues with" him and "they wanted to just get rid of him." Pl. SMF at ¶¶ 43, 46; Day Dep. at 63, 76. In addition, Bolick asked Day whether she was aware of Plaintiff's PTSD diagnosis during the meeting, and that was the first Day heard about it. Pl. SMF at ¶ 44; Day Dep. at 67. Once Bolick told Taylor and Day about the Agreement and Plaintiff's PTSD, Taylor told Day to "check about this." Def. Resp. SMF at ¶ 45; Day Dep. at 70. Thereafter, Day checked the Agreement to see whether Plaintiff's conduct violated it. Def. Resp. SMF at ¶ 45; Day Dep. at 67-70, 102. After Day got a copy of the Agreement from Bolick, she agreed to change her recommendation from demotion to termination. Def. Resp.

SMF at ¶ 49; Day Dep. at 77, 96. These circumstances allow a *prima facie* inference that Plaintiff was fired because of his PTSD.

Defendant, however, has put forth legitimate, non-discriminatory reasons as to why they terminated Plaintiff's employment: because Plaintiff violated the Prohibited Conduct policy and his Return to Work Agreement by refusing to work an overtime shift and exhibiting insubordination. As such, it is for Plaintiff to put forth significant evidence of pretext, discussed below.

b. Pretext

A plaintiff may carry his burden of showing that the employer's proffered reasons are pretextual by showing that they have no basis in fact, that they were not the true factors motivating the decision, or that the stated reasons were insufficient to motivate the decision. A plaintiff can either directly persuade the court that a discriminatory or retaliatory reason more likely motivated the employer or show indirectly that the employer's ultimate justification is not believable. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1522 (11th Cir. 1991). In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the

adverse employment decision. *Burdine*, 450 U.S. at 256; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973).

To demonstrate pretext, a plaintiff must cite to evidence that "reveal[s] 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.'" *Vessels v. Atlanta Indep. School Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004)). "[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228) (11th Cir. 1993)). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." *Young v. General Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988). "When the proffered legitimate, nondiscriminatory reason is plaintiff's violation of a work rule" the Eleventh Circuit has held that the "work rule" defense "may be pretextual when a plaintiff submits evidence (1) that he did not violate the cited work rule, or (2) that if he did violate the rule, other employees outside the protected class,

who engaged in similar acts, were treated differently." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.2d 1354, 1353 (11th Cir. 1999).

The pretext issue presented in this case is unusual. At a certain level, it is undisputed that Plaintiff's termination was interrelated with his PTSD. After all, it was Plaintiff's PTSD that led to him being found unfit to work as a firefighter, which then led to his having to sign the Return to Work Agreement. It appears to be at least plausible that his PTSD– and resulting limitations in controlling anger and in interacting with supervisors– likely contributed to if not triggered the insubordination that Defendant relies on. This act in turn constituted a breach of the Return to Work Agreement.

Further, a jury could find, based on the chronology of events and discussions between Day and Taylor, that Plaintiff's insubordinate refusal to work overtime would not have in itself resulted in termination for other, healthy, employees. After all, Day recommended that Plaintiff only be disciplined, not fired, for this conduct, until after learning of his diagnosis. Regardless of whether she or Taylor made the ultimate decision, the evidence more than supports the inference that this termination decision would not have been made but for Defendant's knowledge of Plaintiff's condition.

Nevertheless, Defendant was not required to employ a firefighter who was incapable of controlling anger, communicating appropriately with others, and

handling stress. Indeed, the entire purpose of the Return to Work Agreement was to attempt to put in place conditions to help allow Plaintiff to meet these requirements and provide a remedy for Defendant if he could not.

In this context, it was not inappropriate for Day and/or Taylor to consider Plaintiff's insubordinate act in the broader context of his illness. Isolated misconduct by a healthy person otherwise capable of responding to ordinary workplace discipline may not necessitate termination. But that same misconduct by someone already found to be mentally unfit to serve on the basis of an inability to handle stress, control emotions, and appropriately interact with supervisors, and who has only been allowed to keep working on certain conditions that he could not comply with, may warrant a different response. In other words, Day and Taylor were entitled to consider that Plaintiff's act of insubordination was part of a broader pattern of behavior related to his PTSD, and that he committed the act despite being given the opportunity to continue working pursuant to a Return to Work Agreement.

The real question, therefore, is whether Day or Taylor were discriminating against Plaintiff because of a condition that was otherwise controllable and subject to accommodation. Because if, instead, they terminated him based on a condition that interfered with job duties in a way that could not be accommodated, that would not violate the ADA. While not put in the most tactful or thoughtful way, Day's

statements such as "you can't accommodate these people," do not necessarily suggest anything more than this, *i.e.*, that Plaintiff's PTSD and resulting limitations were seen as inconsistent with the job duties of a firefighter. Significantly, Plaintiff does not rebut the suggestion that "you can't accommodate these people," and continues to offer no reasonable accommodations that he believes were available.

Nevertheless, the question of pretext only arises if and to the extent a plaintiff can already demonstrate that he is qualified, that is, that he can perform the job at least with reasonable accommodations. As noted above, the Court finds a lack of evidence on this question, and recommends that summary judgment be granted on that basis entirely. But the Court is discussing the issue of pretext anyway, in the event that it may be helpful should any reviewing court disagree with the undersigned's resolution of the "qualified individual" question. By definition, therefore, the question of pretext will only arise should a reviewing court find that Plaintiff has adduced sufficient evidence that he remained able to perform the essential duties of this job despite his condition. Given that procedural context, summary judgment could not be granted on the independent basis that Plaintiff cannot show evidence of pretext. Assuming, contrary to the undersigned's recommendation, that Plaintiff was "qualified," it would have been impermissible for Defendant to terminate Plaintiff because of his PTSD. And the record as relayed above would clearly permit a jury to conclude that

Defendant did just that, *i.e.*, terminate Plaintiff because of his PTSD. Therefore, while summary judgment as to the issue of discriminatory discharge should be granted on other grounds, there would be no grounds to grant summary judgment on the specific issue of failure to show evidence of pretext.

## III. RECOMMENDATION

For the above reasons, **IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment [44] be **GRANTED**, and that judgment be entered in favor of Defendant on all of Plaintiff's claims.

As this is a Final Report and Recommendation, there is nothing further in this action pending before the undersigned. Accordingly, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**IT IS SO RECOMMENDED** this 12th day of December, 2016.

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE